## CAROLINAS BRANCH, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., Plaintiff,

### v.

**Juanita KREPS, Secretary of Commerce of the United States of America, James B. Edwards, Governor of the State of South Carolina, William A. Slover, Mayor of the Town of Batesburg, Stanley Goodwin, Mayor of the Town of Cayce, and Paul E. Waites, Mayor of the Town of West Columbia, Defendants.**

Civ. A. No. 77–2326.

United States District Court,
D. South Carolina,
Columbia Division.

Dec. 13, 1977.

---

Julius W. McKay, Columbia, S.C., John B. Taylor, Miller, Johnson, Taylor, & Allison, Charlotte, N.C., for plaintiff.

C. David Sawyer, Jr., Ridge Spring, S.C., Griffith, Coleman & Sawyer, Saluda, S.C., for William Slover, Mayor, Batesburg.

C. Tolbert Goolsby, Jr., Deputy Atty. Gen., Kenneth P. Woodington, Asst. Atty. Gen., Columbia, S.C., for James B. Edwards.

Glen E. Craig, Asst. U. S. Atty., Columbia, S.C., Robert T. Moore, Deborah M. Seymour, Attys., Civil Rights Div., Dept. of Justice, Washington, D.C., for Juanita Kreps, Secretary of Commerce.

Jack R. Callison, West Columbia, S.C., for Paul Waites, Mayor, W. Cola.

Donald D. Aaron, Columbia, S.C., for Stanley Goodwin, Mayor, Cayce.

### ORDER ON PLAINTIFF'S MOTION FOR A TEMPORARY INJUNCTION

HEMPHILL, District Judge.

This controversy arises under the Local Public Works Capital Development and Investment Act of 1976, 42 U.S.C. § 6701, *et seq.*, as amended by the Public Works Employment Act of 1977, Pub.L. 95–28, 91

Stat. 116 (enacted May 13, 1977) (hereafter the "Act"). The Act establishes a program of federally assisted public works construction projects to be administered by the Secretary of Commerce through the Economic Development Administration (EDA). Pursuant to this program, EDA distributes grants under the Act to state and local governments for the construction of needed public works projects. Grantees are required in turn to contract out project construction to the private sector. Congress has appropriated $4 billion to be spent under the Act during fiscal 1977. Pub.L. 95–29, 91 Stat. 122 (enacted May 13, 1977).

Through this action plaintiff challenges as unconstitutional § 103(f)(2) of the 1977 amendments to the Act, and seeks to enjoin its implementation throughout the State of South Carolina, and particularly with respect to certain grants made to the Cities of Batesburg, Cayce, and West Columbia, South Carolina. The provision provides that, except to the extent the Secretary of Commerce determines otherwise, minority business enterprises shall be awarded contracts for at least 10 percent of the funds of each grant approved under the program. Specifically, the provision (hereafter "the MBE provision") states:

> Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprises" means a business at least 50 per centum of which is owned by minority group members or, in case of publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

As of September 30, 1977, EDA had approved $30,250,130 worth of projects (96 grants) under the Act for the State of South Carolina; and $814,560 worth of projects (3 grants) in Lexington County, South Carolina, including a $346,000 grant to Batesburg, a $166,440 grant to Cayce, and a $302,120 grant to West Columbia. A total of 8591 grants have been approved nationwide. At the present time, advertising for bids, letting of contracts, and initiation of construction is well underway in this area and nationwide. Contracts for the three Lexington County projects have already been awarded.

Plaintiff is a non-profit trade association in the construction, contracting industry organized and existing under the laws of the State of North Carolina "to promote better relations between private owners or public bodies, their architects, or engineers, and the general contractor; to maintain high professional standards in the conduct of work; to combat unfair practices; to encourage efficiency; to correct conditions of an unsatisfactory character; to encourage those methods of contracting which relieve the contractor of improper risks; and to promote sound business practices, so as to raise the standing of contractors in the business world."

At open hearing plaintiff introduced testimony of several contractors, members of plaintiff association, who had been denied awards of contracts on these EDA projects, even though they were low bidder, for failure to meet the MBE requirement. Plaintiff further alleges that under the Act minority business enterprises need not meet bond requirements nor necessarily shoulder responsibility for providing capital needed by them for effective performance of their duties.

Plaintiff contends that such a requirement is violative of "federal equal protection" [1] in that it invidiously discriminates

1. Although the Fifth Amendment contains no equal protection clause, the standard of invidious discrimination for Fifth Amendment Due Process purposes is coextensive with a Fourteenth Amendment equal protection claim based on invidious discrimination. *Richardson*

on the basis of race, precluding non-minority businesses from exercising their constitutionally protected fundamental right to do business by creating a rigid quota system for minority business concerns. Plaintiff also urges that provisions within the Act, namely 42 U.S.C. § 6727, and Title VI of the 1964 Civil Rights Act and the statutory tools for enforcement thereof, the Civil Rights Act of 1866 and 1872, are in direct contradiction to each other and therefore violative of substantive due process rights of the plaintiff.[2]

Before the court is plaintiff's Motion for a Temporary Injunction under Federal Rules of Civil Procedure 65(a) to enjoin the enforcement of the MBE provisions by the Secretary of Commerce in the State of South Carolina, pending a determination of the case on the merits.

The propriety of the issuance of the injunction here sought is governed in this circuit by the recent case of *Blackwelder Furniture Co., etc. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir. 1977) which "clarified" the nature and weight of considerations to be utilized in determining whether or not the issuance of the preliminary injunction by a *trial court* is proper.

The late Circuit Judge Craven (writer of *Blackwelder*) reasoned that what many courts considered as the proper test for determination of issuance of a temporary injunction[3] is the standard properly administered by appellate courts when confronted with the question of whether or not to issue an appellate stay pending review of the trial court's disposition of the controversy on the merits; *id.* at pp. 193–194, but that the proper test for use at the trial court level is the so-called balance-of-hardship test first formulated by the Eighth Circuit

in the case of *Love v. Atchison, T & S. F. Ry. Co.,* 185 F. 321 (1911) and later adopted by the United States Supreme Court in *Ohio Oil v. Conway,* 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972 (1929), and followed in the Fourth Circuit in 1932 in the case of *Sinclair Refining Co. v. Midland Oil,* 55 F.2d 42.

■ *Blackwelder* mandates the district court to apply as the first step for a Rule 65 injunction a balancing of the likelihood of irreparable harm to the plaintiff as against the likelihood of harm to defendant. In explaining the irreparable harm requirement the court at page 196 stated:

> [W]hile "irreparability" may suggest some minimum of probable injury which is required to get the court's attention the more important question is the *relative* quantum and quality of plaintiff's likely harm. The decision to grant preliminary relief cannot be intelligently made unless the trial court knows how much the precaution will cost the defendant. If it costs very little, the trial court should be more apt to decide that the threatened injury is "irreparable" for purposes of interlocutory relief.

The test in theory and practice is less rigid than the comparative appellate test, and logically so for the appellate (stay) decision usually must be made in the context of a controversy already decided on the merits. Although a "flexible interplay" among the four factors discussed supra at footnote 3, is allowed as a factor to be considered either along with or after the initial query, it is implicit in the decision that where a clear imbalance of hardship appears in favor of one party or the other further inquiry is unnecessary. Note, however, that the

---

*v. Belcher,* 404 U.S. 78, at 81, 92 S.Ct. 254, 30 L.Ed. 231 (1971).

**2.** Although plaintiff cites the court no authority, the due process claim presumably arises from the fact that plaintiff's members can not predictably arrange their affairs. This is similar to an unconstitutionally vague argument with regards to noncriminal statutes. See *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1973).

**3.** That test being:

1) Has the petitioner made a strong showing that it is likely to prevail upon the merits?

2) Has the petitioner shown that without such relief it will suffer irreparable injury?

3) Would the issuance of the injunction substantially harm other interested parties?

4) Wherein lies the public interest?

"flexible application" of the factors, although rigid application is unnecessary, allows the court to "plug them into the equation"; and the less the imbalance more is the weight given the balance factor. p. 195.

The question here promulgated is: What is the quantum and quality of plaintiff's potential harm in relation and relative to the potential harm to defendants? Assuming *arguendo* that there are further funds to be distributed in the State of South Carolina, the harm is this: Certain members of the member association will fail to acquire work by bids which would normally be sufficient for acquisition of the job.[4] Certain other members probably will acquire jobs and therefore benefit from this application of federal funds which would otherwise be unavailable. The court notes with some skepticism—theoretically the MBE provision has a "safety value" procedure by which the grantee of funds under the Act can apply for a waiver of the ten percent requirement. See 13 CFR 317.19(b) and Guidelines to Round II of the Local Public Works Program. The procedure has a rigid format which must be followed.[5] The major consideration once the decision process is initiated is whether or not the grantee has made adequate efforts to locate qualified minority enterprises in terms of peculiar geographic locations. "Theoretically", then, it is arguable, assuming proper administrative procedures are followed by plaintiff, and assuming the process is properly administered bureaucratically, that no harm will be occasioned by plaintiff's members.

Before discussing defendant's potential harm, the court is compelled to discuss defendant's relationship to the funds and projects which the Act provide for, and the very nature of the Act itself.

The Act, and the appropriations pursuant thereto, were enacted in order to assuage the nagging problem of unemployment throughout the nation and to revitalize a sagging, recessionary national economy by providing State and local governments with funds to build needed public facilities. H.R. Rep. No. 94–1077, Pub.L. No. 94–369, 94th Cong., 2d Sess. (1976).[6] The legislative history of the 1977 MBE amendment is scant. Ostensibly it serves a purpose both consistent with and ancillary to the dominant thrust of the Act. That is, to assure minority business participation in federally funded projects to a greater extent than the nominal participation heretofore experienced; and thus to stimulate the minority economic community (which the legislature recognizes as a small community within the larger, national economic community). Although the court is careful at this stage of the dispute to "steer clear" of the merits of the dispute at this time, this ancillary purpose is sought to be accomplished in ameliorative terms by a bottom-line affirmative action program, in pejorative (if not accurate) terms by imposition of a rigid racial quota.

With the background of the Act laid out, it becomes obvious that the defendants are mere conduits through which these funds flow in order to benefit the public at large. The power of all public servants is derivative of the public they serve. The potential harm which must be weighed on the defendants' side of the equation, therefore, must be considered in terms of harm to the public interest.

The Ninety-Six, South Carolina, EDA projects are expected to generate approximately 3593 to 3884 persons years of em-

4. Perhaps it would be profane to call this "built-in" crimination by Act of Congress; certainly it reflects a clear portrait of legislation for racial purposes. Would one suggest an overtone of voter appeal?

5. Defendant's exhibit # 1 is the affidavit of W. Arch Bratton, Deputy Director of the Local Public Works Unit of the Southeastern Region, EDA, located in Atlanta, Georgia. The affidavit states that of all the LPW projects in South Carolina, only one request for waiver has been tendered, that waiver request concerning EDA Project No. 04–51–22512 in Oconee County. The EDA regional office responded that the request was an invalid one because not made by Grantee as required.

6. 1976 U.S. Code Cong. & Admin. News, Vol. 3, pp. 1746–7.

ployment and result in employment of approximately 7854 workers. See affidavit of Anthony J. Silvetta, Defendants' exhibit E. As of September 30, 1977, EDA has approved $30,250,130 worth of projects in the State of South Carolina, *supra*. At oral argument it was brought out that bidding, letting of contracts, and construction is well on its way on these projects in the State of South Carolina. Indeed, grants under ·the Act cannot be made unless on-site labor can begin within ninety (90) days following the approval of the project. 42 U.S.C. § 6705.

Keeping in mind that all projects and allocations in South Carolina have been approved, and taking into consideration all of the figures mentioned above, this court, which is dutybound to protect the public interest in weighing the hardships, notices that the unknown, potential harm which may befall the public if it enjoins the enforcement of the ten percent MBE provision, may be of such substantial impact as to practically negate the broad advantageous effect that the grants will have on the economy of South Carolina. The ninety (90) day limit has almost run. The inference is that preparation for the imminent start-up of construction has been largely completed. The Act is discretionary, (see language in 42 U.S.C. § 6702). The funds can purportedly be withheld. Since the nature of a preliminary injunction is to preserve the *status quo ante litem*, the equitable power of the court is generally limited to proscriptive relief. The broader equitable power including the power to issue mandatory affirmative relief which the court may institute after determination on the merits is not available at this stage of the proceeding. Therefore compulsion of use of the funds may not be possible. Additional-

ly, the administrative chaos caused at this stage, may itself cause substantial harm to the public interest. Finally, the harm mentioned above is not readily protectable by bond. See *Blackwelder, supra.* As one court confronted with the precise issue before this court put it:

> Where Congress has made clear its intention that these funds be infused into local economies as quickly as possible, the monumental harm that would befall that benefit to the public generally from a restraint imposed by the court eclipses that alleged by the plaintiff . . . . See, *M. Steinthal & Co. v. Seamans*, 147 U.S. App.D.C. 221 [223–225], 455 F.2d 1289, 1301–03 (1971). (exigent needs of government may preclude equitable relief, even where impropriety of agency action is apparent and ultimate compensation may be unobtainable).

The court has made the initial inquiry mandated by *Blackwelder*. In doing so it has considered harm to plaintiff and harm to defendant tied-up with harm to the public interest. As such three of the four components of the appellate-stay test have been incorporated into the trial court equation. Arguably the court could end its query here. However, it chose to discuss the fourth factor, probability of success, subsequent to the initial query. The court feels that such a discussion in this case's peculiar context [7] will serve to temper the balancing process.

Before discussing the probability of success, it is well to note that this court is a court of *stare decisis*. Theoretically such a system of justice allows predictability in the arrangement of human affairs.[8] And it

7. A temporary injunction is the plaintiff's tool. In *Blackwelder*, the court held the district court in reversible error for putting too great a burden on plaintiff to establish his right to the injunction by requiring him to establish a probability of success. Since the burden is on plaintiff, and since' plaintiff seemed to rely heavily on the probability of success bearing at open hearing, the court feels that plaintiff's contention that it will probably succeed on the merits should be handled by the court, so long

as it does not supersede the initial inquiry, but merely serves to temper it.

8. Today the bench and bar of this country if afflicted with a debilitating departure, at appellate level, of this ancient philosophy of English-speaking jurisprudence. The trial court cannot depend on the decisions of the past and the practicing lawyer cannot confidently, or safely, advise his client. The climate has produced an alarming erosion of the solidarity of our admin-

does so by application of legal principles which have been tested and strengthened down through the centuries, most of the principles evolving from the great body of English Common Law. The system is far from perfect, but the process of constant testing and evolution, as made possible by our country's great and dedicated adversaries, has proved to be the soundest and most just legal system in the world. This court is proud to be a part of it.

The issue before the court today,[9] is among the most hotly contested social, philosophical, moral, and legal issues of the decade, an issue not capable of predictable disposition. The courts should of course be concerned only with the legal aspect with this issue, unfortunately higher courts have held that to be impossible, reasoning the very basis of the dispute is sociological, philosophical, and moral in nature.

This country was founded on the precept that all men are created equal. Of course, not equal in substantive terms, but in terms of opportunity. Unfortunately the institution of slavery was in direct contradiction with the precept. Hence the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments which in effect were designed to give former slaves a *status*, a status that purportedly conferred an equality of opportunity. The Civil Rights Act of 1866 and 1872 were designed to effectuate enforcement of the rights which that status supposedly conferred.

The awareness that this set of events spurned resulted in the discovery of other situations in which the precept was being contradicted. There were situations all about where people and groups, especially minorities, were being discriminated against not only because of race, but also because of sex, nationality, age, origin, and wealth, among other reasons. The basic tool used in attacking these situations was and is today the equal protection and due

istration of justice and the practice of law in this country.

**9.** Discussion of which is of course not determinative but necessary in treatment of the probability-of-success test.

process clauses of the Fourteenth Amendment when the states are allegedly culpable [10] and the roughly coextensive due process clause of the Fifth Amendment when the federal government is allegedly culpable.

It is in this context that the current issue is framed and the probability of success will be discussed. The issue is this—in order to remedy prior discrimination may the government discriminate against groups— in this case on the basis of race—which heretofore have not been discriminated against, at least to the degree of the group whose prior discrimination is sought to be remedied? No doubt, eradication of the lingering effects of discrimination against these groups continues to occupy the federal courts. See, e. g., *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1968).

Although eradication of the effect of discrimination is a legitimate consideration, if it discriminates against a group by creating a suspect classification and/or affects a fundamental right, the classification is subject to the test of strict judicial scrutiny. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed. 600 (1969). The test of strict judicial scrutiny requires two tests to be met. First the law must be designed to achieve a governmental objective that serves a "compelling state interest". *Shapiro v. Thompson, supra; McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). The second requirement is

**10.** And in some instances the Thirteen Amendment.

equally important: even where there is a compelling government interest, the challenged classification must be shown to be the least discriminatory means of accomplishing it; i. e., there are no less discriminatory alternatives available. *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1969).

There is no doubt that Congress and the courts have seen fit to attempt to eradicate past injustices in minority and racial discrimination and such goal is legitimate and in some instances compelling in terms of economics, and social welfare goals. Plaintiff urges, however, that imposition of a racial quota, although the most direct means of increasing minority contractor participation,[11] is inappropriate in that it negates constitutionally protected rights and there are less severe ways (other than by racial classification) to remedy the situation. The plaintiff suggests that a less severe racially—neutral classification, a classification of businesses which are small or impoverished would serve the same purpose in a less discriminatory way.[12]

However, courts have recognized that even racially neutral actions often perpetuate past discrimination, and that once discrimination has taken place, it is often necessary to use race a second time to bring about a neutral result. *Green v. County School Board*, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Louisiana v. United States*, 380 U.S. 145, 154–155, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); *Griggs v.*

*Duke Power Company*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *North Carolina Board of Education v. Swann*, 402 U.S. 43, 45, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971).

Defendants urge that the effect of the program is not to eliminate non-minority business participation but to increase it. And that the MBE requirement merely assures that an increase in work which would otherwise not exist is conditioned on a waivable guarantee of minimum minority participation. This court hopes that it misinterprets the government's argument. It seems, however, that they suggest the programs are matters of grace[13] and as such are not constitutionally suspect. This notion is abhorrent to the American system of justice and patently erroneous. In this great country under the notion of fair play and justice it makes no difference whether something received from the government is a matter of grace, a privilege or a right, once granted constitutional protections attach. To suggest otherwise is totally obnoxious to the traditional way of thought. See *Shapiro v. Thompson, supra; Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 287 (1970).[14]

From the above discussion it is readily apparent that the area is in a state of flux.[15] In the past several weeks the Central District of California and the Western District of Pennsylvania have reached the issue of the constitutionality of the MBE requirement on the merits. They have op-

11. Minority firms earn only 1.1 percent of gross industry receipts; average receipts per paid employee were only 57 percent of those of non-minority firms. 1972 Census of Construction Industries, U.S. Summary, Table A.1; 1972 *Survey of Minority-Owned Business Enterprises*, Table 5.

12. Would that remedy the situation? It would at least create a larger group from which the 10% requirement could be satisfied. Would well-off contractors then be discriminated against on the basis of wealth?—another suspect classification. This would seem more readily justifiable in economic terms.

13. Unfortunately for the preservation of the free enterprise system, too many of the bureau-

crats think they are dispensers of grace instead of hired conduits of the taxpayers' monies.

14. This court notices that under the welfare statute in these cases, once potential recipient meets certain requirements, the entitlement attaches. While the grants here in question are discretionary in nature and one's right to benefit thereunder depends upon bidding, bonding, etc., the principle is the same, however.

15. Hopefully, *Regents of the University of California v. Bakke,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976) cert. granted, 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535, will help to clear up the area.

**400**

positely concluded. Judge Hauk in California held the requirement to be an invidious racial quota unsupported by a compelling governmental interest unrelated to race. Additionally he held that a racially-neutral program could be administered which would avoid a rigid race quota, and be a less severe form of classification. He further held that Title VI of the 1964 Civil Rights Act could not be read consistently with the MBE provision, and that the policy embodied in Title VI prohibiting racial discrimination although more general in nature [16] than the MBE provision, controlled it and as a practical matter nullified it. See *Associated General Contractors of California v. Secretary of Commerce,* 441 F.Supp. 955 (C.D.Cal.1977). Judge Snyder reached the opposite conclusion in Pennsylvania. See *Constructors Association of Western Pennsylvania v. Kreps,* 441 F.Supp. 936 (W.D. Pa.1977).

■ In light of the above the court concludes that it is reasonably possible that plaintiff would succeed on the merits assuming the controversy is ripe for adjudication at that time.[17] Such a showing is insufficient to have a substantial effect in the balancing of potential harms previously discussed—where one party's imbalance clearly outweighs the others.

At this juncture, the court wishes to digress briefly. Eradication of discrimination is an admissible goal. The government agencies, however, which are charged with eradication, and armed with the tools for shaping equality, often breed inequality. Intimately woven into the American fiber is (or was) the notion that a man can be as good as he wants to be if he is willing to pay the price no matter who he is. As before mentioned this court is a court of *stare decisis* and when deciding the merits of this case will strictly adhere to the effect of binding decisions on it and render its judgment accordingly. However, this court questions the eradication of the noble principle that he who is of merit shall be rewarded therefor. This court desires equal opportunities be given men of all colors and origins. No matter what the law is (and this court will enforce the law) this court fears that the granting of jobs, positions and opportunities by the government for public projects to one man who may be of lesser merit than another, simply because of his origin or peculiar situation, will breed discontent, break the competitive spirit, contribute to the decline of a "do your best" attitude, and give the public an inferior product.

In light of the potential harm to the public interest which may be occasioned by issuance of a temporary injunction before a determination of the dispute on the merits, plaintiff's motion for the same is denied.[18]

AND IT IS SO ORDERED.

---

**16.** Generally the provisions of a specific statute controls the provisions of a general one. This Judge Hauk determined was overcome by the strength of the policy embodied in Title VI.

**17.** Defendants say that adjudication will not be ripe.

**18.** The parties agreed that His Excellency, the Governor of South Carolina should be dismissed as a party defendant and this was orally ordered by the court, is here enforced.