CONSTRUCTORS ASSOCIATION OF WESTERN PENNSYLVANIA, Appellant,

v.

Juanita KREPS, Secretary of Commerce of the United States of America, Milton J. Shapp, Governor of the Commonwealth of Pennsylvania and Richard Caliguiri, Mayor of the City of Pittsburgh.

No. 77–2335.

United States Court of Appeals, Third Circuit.

Argued Jan. 3, 1978.

Decided March 7, 1978.

Charles R. Volk, Jane A. Lewis, Joseph Mack, III, Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellant.

Blair A. Griffith, U. S. Atty., Pittsburgh, Pa., Robert J. Hickey, G. Brocjwek Heylin, Kirlin, Campbell & Keating, Washington, D. C., for Associated General Contractors of America, amicus curiae.

Robert J. Bray, Jr., Walter H. Flamm, Jr., Alfred J. D'Angelo, Jr., Cunniff, Bray & McAleese, Bala Cynwyd, Pa., for General Building Contractors Association, Inc., amicus curiae.

John W. Finley, Jr., Brashich & Finley, New York City, for The Mid-Atlantic Legal Foundation, amicus curiae.

Edward C. First, Jr., Jason S. Shapiro, McNees, Wallace & Nurick, Harrisburg, Pa., for The Associated Pennsylvania Constructors, amicus curiae.

Drew S. Days, III, Asst. Atty. Gen., Brian K. Landsberg, Jessica Dunsay Silver, Vincent F. O'Rourke, Jr., Attys. Dept. of Jus-

tice, Washington, D. C., Robert S. Fastov, Kenneth Oestreicher, Dayle Ginsburg, Attys., Economic Development Administration, U. S. Dept. of Commerce, Washington, D. C., for appellee, Juanita Kreps.

Patricia G. Miller, Asst. Atty. Gen., Michael Louik, Deputy Atty. Gen., Robert P. Kane, Atty. Gen., Pittsburgh, Pa., for appellee, Milton J. Shapp.

Eugene B. Strassburger, III, Deputy City Sol. Mead J. Mulvihill, Jr., City Sol., Pittsburgh, Pa., for appellee, Richard S. Caliguiri.

Bolger & Picker, Philadelphia, Pa., for The Roofing Sheet Metal Contractors' Association of Philadelphia and Vicinity, amicus curiae; Steven R. Waxman, Philadelphia, Pa., of counsel.

Before ADAMS, GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The question in this case is whether the district court abused its discretion in declining to issue a preliminary injunction enjoining the United States Department of Commerce, the Commonwealth of Pennsylvania and the City of Pittsburgh from complying with a federal statute which requires 10% of all federal funds in specified public works projects to be expended on bids tendered by "minority business enterprises."

### A. FACTS

In July of 1976, Congress enacted the Local Public Works Capital Development and Investment Act (LPW).[1] The LPW established a program to distribute two billion dollars to state and local governments for public works projects in order to stimulate the national economy. In January of 1977, legislation was introduced to provide additional funding of the LPW, denominated "Round II." Because under "Round I" only 1% of the funds allocated to state and local governments had reached minority contractors, the LPW was amended in mid-1977 to require that 10% of the amount of each LPW grant be expended in connection with contracts with "minority business enterprises" (MBEs), unless the Secretary of Commerce waives the requirement.[2]

Under the LPW program, the City of Pittsburgh requested grants totaling $11,000,000, and the Department of Transportation, of the Commonwealth of Pennsylvania, applied for a similar amount of funds. By September 30, 1977, Pittsburgh had re-

1. 42 U.S.C. § 6701–6710.

2. That amendment, 42 U.S.C. § 6705(f)(2), provides as follows:

> Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprises" means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos and Aleuts.

The MBE set-aside has been the subject of considerable litigation. *See Associated General Constructors of California v. Secretary of Commerce,* 441 F.Supp. 955 (C.D.Cal.) (holding the provision unconstitutional and enjoining future enforcement); *Florida East Coast Chapter of Associated General Contractors of America v. Secretary of Commerce,* No. 77–8351 Civ. J. W. (S.D.Fla. November 1977) (refusing to grant preliminary injunction against enforcement of the provision); *Carolinas Branch, Associated General Contractors v. Kreps,* 442 F.Supp. 392 (D.S.C. Columbia Div. 1977) (denying preliminary injunction); *Fullilove v. Kreps,* 443 F.Supp. 253 (S.D.N.Y. 1977) (upholding constitutionality of MBE provision); *Montana Contractors Assn. v. Kreps, 439 F.Supp. 1331 (D.Mont. 1977);* Wright Farms Construction Inc. v. Kreps, *444 Supp. 1023 (D.Vt.1977) (holding MBE provision unconstitutional as applied to Vermont).*

Although counsel did not mention the fact at oral argument, *Associated General Contractors of California v. Secretary of Commerce* is currently being appealed directly to the Supreme Court under 28 U.S.C. § 1252. *See Associated General Contractors of California v. Secretary of Commerce,* 77 F.R.D. 31 (C.D.Cal.1977).

ceived approval for approximately $9,000,-000 worth of projects, and the Department of Transportation had received approval of seven projects costing over $11,000,000. Since the LPW required that construction on any project begin within 90 days of the allocation of a grant, bidding for the Pittsburgh and the Department of Transportation projects proceeded on accelerated schedules.

On September 8, 1977, the Constructors Association of Western Pennsylvania, a 95-member non-profit association of heavy construction contractors, filed a complaint in the District Court for the Western District of Pennsylvania attacking the legislation on the ground that the MBE requirement discriminated against its members, who were all white, in violation of the equal protection components of the Fifth and Fourteenth Amendments. The Association sought a temporary restraining order to prohibit Pittsburgh, the Transportation Department of the Commonwealth of Pennsylvania, and the Secretary of Commerce from enforcing or taking action to solicit or to accept bids based on the MBE requirement. The Association also requested injunctive and declaratory relief.

After notice and hearing, Judge Daniel J. Snyder on September 12, 1977, denied the request for a temporary restraining order. He held a hearing on September 30, 1977, regarding the plaintiff's request for a preliminary injunction. In an opinion dated October 13, 1977, Judge Snyder denied the request for a preliminary injunction. This appeal from that denial followed.[3]

## B. THE STANDARDS

■ The narrow issue before us is whether the district court abused its discretion in refusing to grant the preliminary injunction sought by the plaintiff.[4] Our analysis of the plaintiff's contention that such an abuse did, in fact, occur is framed initially by the factors which the district court was required to take into account in evaluating an application for a preliminary injunction. "The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance, he will suffer irreparable injury and also that he is likely to prevail on the merits."[5] More specifically, this Court has consistently identified four factors which must be examined in ascertaining the propriety of a preliminary injunction:

3. On October 17, 1977, the plaintiff filed a notice of appeal from the district court's order. Plaintiff also filed a motion for injunction pending appeal, which the district court denied. On October 19, 1977, this Court declined to grant the plaintiff's motion for an injunction pending appeal, referred the plaintiff's motion for summary reversal to a merits panel, and established an expedited briefing and argument schedule.

4. At oral argument, the Contractors asserted that the ruling below was a declaratory judgment as well as a denial of a preliminary injunction. The defendants disputed that contention. While the matter is not entirely free from doubt, cf. *Montana Contractors' Assn. v. Secretary of Commerce*, Civ. No. 77–62, 439 F.Supp. 1331 (D.Mont. Missoula Div. 1977) (interpreting the decision by the trial court as "declaring the MBE provision constitutional"), it appears from the record before us that Judge Snyder intended to deal only with the propriety of issuing of a preliminary injunction.

In his order of September 13, 1977, Judge Snyder described the hearing which he set for September 30, as a "Hearing on Preliminary

Injunction". Similarly, the order entered on October 13, 1977 made no mention of a declaratory judgment, but simply denied the request for preliminary injunction. In its "Motion for Injunction Pending Appeal" the plaintiff, on page 2, describes the October 13 order as denying the request for preliminary injunction, and in its notice of appeal plaintiff appealed from an order "denying plaintiffs request for a Preliminary Injunction."

We therefore interpret Judge Snyder's discussion of the constitutionality of the MBE provision as an evaluation of the plaintiff's "likelihood of success on the merits" in the context of a denial of preliminary injunctive relief, rather than in the context of a declaratory judgment.

5. *Doran v. Salem Inn*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); see *Sampson v. Murray*, 415 U.S. 61, 88–92, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Brown v. Chote*, 411 U.S. 452, 456, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973); *Granny Goose Foods Inc. v. Teamsters*, 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).

. . . the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. *Delaware River Port Auth. v. Transamerican Trailer Transp. Inc., supra,* [501 F.2d 917,] at 919–20 (3d Cir.); *see A. L. K. Corp. v. Columbia Pictures, Inc.,* 440 F.2d 761, 763 (3d Cir. 1971). Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Delaware River [Port] Auth. v. Transamerican Trailer Transp., Inc., supra* at 920.[6]

█ While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements.[7] On the basis of the data before it, the district court must attempt to minimize the probable harm to legally protected interests between the time that the

motion for a preliminary injunction is filed and the time of the final hearing.[8]

█ Thus, for example, in a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate "even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required."[9] In contrast, where the threatened irreparable injury is limited or is balanced to a substantial degree by countervailing injuries which would result to third parties, or to the public interest from the issuance of an injunction, "greater significance must be placed upon the likelihood that the party will ultimately succeed on the merits of the litigation."[10]

█ This Court's analysis is further constrained by the standard of review appropriate to appellate examination of a decision to deny a preliminary injunction. Absent an obvious error of law or a serious mistake in the consideration of proof, the trial court's decision will be reversed only for an abuse of discretion.[11]

6.  *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975); *A. O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir. 1976); *Ammond v. McGahn,* 532 F.2d 325, 329 (3d Cir. 1976); *Systems Operations, Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131, 1141 (3d Cir. 1977); *Glasco v. Hills,* 558 F.2d 179, 180 (3d Cir. 1977). *See Sampson v. Murray,* 415 U.S. 61, 84 n.53, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

7.  *Delaware River Port Authority v. Transamerican Trailer Transport Inc.,* 501 F.2d 917, 920, 923–24 (3d Cir. 1974); *see Brown v. Chote,* 411 U.S. 452, 456, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973) ("issuance of the injunction reflected the balance which that court reached in weighing those two factors"); *Oburn v. Shapp,* 521 F.2d 142 (3d Cir. 1975) (requiring "balancing of interests"); *A. O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir. 1976) *quoting United States Steel Corp. v. Fraternal Assn. of Steelhaulers,* 431 F.2d 1046, 1048 (3d Cir. 1963) ("a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief").

8.  *See* Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harv. L.Rev. 525, 540–49 (1978) (suggesting that attempt to minimize probable

harm to protected interests *pendente lite* synthesizes previous doctrine).

9.  *Delaware River Port Auth. v. Transamerican Trailer Transport Inc.,* 501 F.2d 917 (3d Cir. 1974). *See Atch. Top. & S. F. R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 822 n.15, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (Plurality opinion of Marshall, Burger, Stewart and Blackmun, JJ.); *Semmes Motors Inc. v. Ford Mtr. Co.,* 429 F.2d 1197, 1205–06 (2d Cir. 1970) (per Friendly, J.).

10.  *Delaware River Port Auth. v. Transamerican Trailer Transport Inc.,* 501 F.2d 917 (3d Cir. 1974). *See Oburn v. Shapp,* 521 F.2d 142, 152 (3d Cir. 1975).

11.  *Glasco v. Hills,* 558 F.2d 179, 180 (3d Cir. 1977); *see Doran v. Salem Inn,* 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Brown v. Chote,* 411 U.S. 452, 457, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973); *A. O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir. 1976); *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975); *Scooper Dooper Inc. v. Kraftco,* 460 F.2d 1204 (3d Cir. 1972); *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 920 (3d Cir. 1974).

In view of this test, we turn to an examination of the four components which guide judgment regarding the issuance of a preliminary injunction.

## C. LIKELIHOOD OF SUCCESS ON THE MERITS

██ We accept, as did Judge Snyder, the plaintiff's contention that racial classifications by government are not to be taken lightly. Such governmental actions are in tension with fundamental ideals of our society, and run the risk of both devisiveness and oppression. Racial classifications may be upheld only in limited circumstances, and are subject, in constitutional parlance, to "strict scrutiny." [12]

██ The fact that the MBE provision embodies a racial classification, however, is not sufficient to guarantee the plaintiff in this case a likelihood of success, for the courts have upheld the use of racial classification by government in attempts to remedy the effects of past discrimination. Thus, for example, in *E.E.O.C. v. American Telephone and Telegraph Co.*,[13] this Court rejected a constitutional challenge to the propriety of a consent decree which provided for the overriding of a seniority system when hiring failed to meet specified racial, sexual and ethnic "targets." We noted that the federal interest in "remedying the effect of a particular pattern of employment discrimination" and in "having all groups fairly represented in employment" was sufficient to justify the use of quotas to accomplish those goals.[14]

Likewise, in *Contractors Assn. of Erie, Pa. v. Secretary of Labor,* 442 F.2d 159, 176–77 (3d Cir. 1971), we upheld the remedial use of racial employment "goals" by the executive without a prior adjudication that discrimination existed.[15] Most recently, in

---

**12.** Governmental actions which classify individuals according to race have, for the past two decades, been constitutionally suspect under the Fourteenth Amendment. *See Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). The Supreme Court has stated that such actions can be justified only when they are necessary to vindicate "compelling state interests." *Id.*

The Supreme Court has also held that the due process clause of the Fifth Amendment embodies the equal protection principles of the Fourteenth. *E. g. Buckley v. Valeo,* 424 U.S. 1, 3, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Hampton v. Mow Sun Wong,* 426 U.S. 88, 99–100, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

We note, however, that both the Thirteenth and Fourteenth Amendments empower Congress to enact legislation to remedy racial discrimination, U. S. Const. Amendment XIII Sec. 2; Amendment XIV Sec. 5; *cf. Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437–44, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Runyon v. McCrary,* 427 U.S. 160, 168–72, 96 S.Ct. 2586, 49 L.Ed.2d 515 (1976), and the Supreme Court has held that such authorization may supersede the limitations of previous amendments. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 451–56, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (legislation adopted to remedy employment discrimination supersedes Eleventh Amendment). *Cf. Hampton v. Mow Sun Wong,* 426 U.S. 88, 100, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) (protection of Fifth Amendment is not coextensive with Fourteenth; overriding national interests may justify federal legislation unacceptable for state).

**13.** 556 F.2d 167 (3d Cir. 1977).

**14.** 556 F.2d at 179–180. Similar use of racial criteria in attempts to remedy judicially identified discrimination have been approved in other situations. *See e. g. Franks v. Bowman Transportation Co.,* 424 U.S. 747, 778, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Swann v. Bd. of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *United States v. Int. Union of Elevator Const.,* 538 F.2d 1012, 1018–20 (3d Cir. 1976); *Erie Human Relations Commn. v. Tullio,* 493 F.2d 371 (3d Cir. 1974); *id.* at 375 (Adams, J. concurring), *cf. Oburn v. Shapp,* 521 F.2d 142, 149 (3d Cir. 1975).

**15.** *Cf. Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed. 189 (1974) (special tax exemption for widows permissible to remedy general discrimination against women in economic system); *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977) (preferential social security provisions upheld as remedy for general economic discrimination against women); *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (preferential hiring of American Indians upheld).

*United Jewish Organizations v. Carey,*[16] the Supreme Court sustained a deliberate use of race by government officials in drawing voting districts so as to achieve 65% majorities of nonwhite voters in such districts. Three Justices held that even aside from the commands of the Voting Rights Act, such a use of racial criteria was permissible where it produced no stigma, and "did not minimize or unfairly cancel out white voting strength."[17] Two other Justices held the action to be congruent with the Fourteenth Amendment because there was neither evidence of "purposeful discrimination against white voters" nor evidence that the plan "undervalued the political power of white voters"—a predicate from which such a discriminatory purpose might be inferred.[18] Finally, Justice Brennan expressed the opinion that "if and when a decisionmaker embarks on a policy of benign racial sorting, he must weigh the concerns [of the negative aspects of quotas] against the need for effective social policies promoting racial justice in a society beset by deep-rooted racial inequities." 430 U.S. 144 at 175, 97 S.Ct. at 1014.

From such decisions, which provide our guidance at least until the *Bakke* case is decided,[19] it is clear that Judge Snyder properly undertook a careful examination of the purposes and effects of the MBE program. Equally evident, however, is the conclusion that under such investigation, the plaintiff has not presented a strong likelihood of success on the merits. The legislative history of the MBE provision gives no indication that the drafters contemplated "purposeful discrimination" against white contractors.[20] Rather, the set-aside was designed to "begin to redress" what Congress perceived to be the continuing economic impact of racial discrimination.[21] Such a purpose might well be sufficient to allow the legislature to take notice of findings by the government in other aspects of the national anti-discrimination effort to the effect that minority contractors labor under handicaps requiring remedial action.[22] Moreover, the debates in connection with the MBE set-aside evidence a Congressional determination that other attempts to encourage minority businesses have not proved successful.[23] We therefore

16. 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977).

17. 430 U.S. at 165, 97 S.Ct. at 1010 (opinion of White, J., joined by Rehnquist, and Stevens, JJ. on this point).

18. *Id.* at 179–80, 97 S.Ct. at 1017 (Stewart, J. and Powell, J.).

19. *Bakke v. Regents of University of California,* 18 Cal.2d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976) *cert. granted* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 *argued* October 17, 1977, 46 U.S.L.W. 3249 (1977).

20. The goals professed in debate included "building a viable minority business system," Remarks of Rep. Mitchell, 123 Cong.Rec. H. 1437 (daily ed. Feb. 24, 1977); "an equitable relationship for minority contractors and suppliers to be able to participate," Remarks of Rep. Roe, *id.* at H. 1437; and "promoting a sense of economic equality in this nation," Remarks of Rep. Biaggi, *id.* at H. 1440.
　　The concern voiced by Rep. Harsha that the set-aside might discriminate against non-minorities, *id.* at H. 1439, was assuaged by an amendment intended to assure that the MBE provision applied only to areas in which qualified MBEs were available.

21. Remarks of Rep. Mitchell *id.* at H. 1440. *See* Remarks of Rep. Mitchell *id.* at H. 1437 (under current program, minorities are "cut off from contracts" because they are "new on the scene"; at H. 1440 ("minority contractors and businessmen who are trying to enter into the bidding process ' . . .' get the 'works' almost every time"); Remarks of Rep. Harsha ("We are talking about people in the minorities and deprived") *id.* at H. 1440; Remarks of Rep. Biaggi ("This nation's record with respect to providing opportunities for minority business is a sorry one"), *id.* at H. 1441.

22. *See e. g.* Summary of Activities of the Committee on Small Business, House of Representatives, 94th Cong. 2d Sess., H.Rep. 94–1791, 182–83 (1977); U. S. Commn. on Civil Rights, Minorities and Women as Government Contractors (1977); *cf. Hampton v. Mow Sun Wong,* 426 U.S. 88, 103, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976) (". . . if the rule were expressly mandated by the Congress or the President we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption.").

23. *E. g.* Remarks of Rep. Mitchell, 123 Cong. Rec. H. 1437 (daily ed. Feb. 24, 1977).
　　It should be noted that the suggestions by the plaintiffs in this case of "less intrusive" alter-

do not consider it error for Judge Snyder to have ascertained—at least on the basis of the material submitted to him—that the challenged provision was necessary to accomplish Congress' remedial objectives.[24]

Thus, at the level of analysis appropriate for a preliminary injunction, we cannot say that Judge Snyder erred in holding that the plaintiff failed to demonstrate a significant likelihood of succeeding on the merits.

## D. IRREPARABLE INJURY

Nor is the modest probability of plaintiff's success outweighed by a greater potential for irreparable injury to the Association and its members. At the hearing the plaintiff alleged three sources of irreparable injury to its member contractors. On examination none of these claims requires reversal of the district court's order.

First, the plaintiff asserted that its members, who are white, were deprived of the profits to be garnered from LPW construction contracts when they were forced to subcontract to meet the MBE requirements. The only example in support of this contention which was adduced at trial was the Brayman Construction Company, the recipient of a $165,000 contract to build a bridge in Mercer County. The Vice President of Brayman testified that in order to meet the minority set-aside requirement, Brayman subcontracted $15,600 of work which Brayman otherwise would have done itself to R. L. Johnson Co., a minority contractor. Since, however, Brayman owned 49% of Johnson, in effect the contract represented only $8,000 of lost business. Further, as to that $8,000, the Vice President of Brayman testified that he could make no estimate whether a profit could be anticipated.[25] It was not an abuse of discretion for Judge Snyder to determine that such a limited or conjectural "injury" was not sufficient to support issuance of a preliminary injunction.[26]

Second, the plaintiff asserted that its members would be damaged by being forced to seek out and deal with minority contractors with whom they would ordinarily not do business, thereby disrupting their commercial relationships.[27] There is no evidence in the record that such a change in operating procedures would significantly burden the business enterprises of the Association's members. Indeed, the only "injury" alleged is precisely the result which the MBE provision seeks to accomplish: established contractors are required to admit minnesses from proportionate participation. This MBE provision will afford minority businesses this heretofore lacking opportunity to acquire experience, establish a reputation and rebut misconceptions about minority business capability.
Slip op. at 23–25, 376a–378a.

natives which are available, such as government bonding of minority contractors, would appear to involve no less governmental allocation on the basis of race than the statutes to which they object in the first instance. Such "alternatives" also distribute scarce federal funds on the basis of racial classifications, but merely do not allocate such money out of public works projects.

**24.** Judge Snyder stated:
. . . capital and technical assistance programs do nothing to overcome barriers existing due to lack of confidence in minority business ability or racial prejudice and misconceptions.
Some other mechanism is therefore needed to guarantee participation by available and qualified minority businesses to give them a foothold in the competitive market. The 1% level which alternative programs have been unable to increase, at least in the short run, will not afford the opportunities to develop the experience, skills and reputation looked for in a competitive market. A percentage set-aside is the only effective way to crack the competitive barriers and end the cycle which continually excludes minority busi-

**25.** 231a.

**26.** See Glasco v. Hills, 558 F.2d 179, 181–82 (3d Cir. 1977); A. O. Smith v. FTC, 530 F.2d 515, 527–28 (3d Cir. 1976); cf. Doran v. Salem Inn, 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (probable bankruptcy was irreparable injury).

**27.** See Judge Snyder's opinion, p. 12, 362a (contractors "are forced . . . to add race as at least one if not the primary factor in the complexity of considerations involved in the business judgment, thus disturbing the balance of other factors contractors normally weigh"); Plaintiff's Brief p. 12 ("the survival of businesses which enter such contracts is in serious jeopardy").

norities into their circle of business dealings. While such compliance with the statutory provision represents an alteration in past practices, it does not rise to the level of irreparable injury. In this connection, we note the comments in *A. O. Smith Corp. v. FTC*:

> Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it would hardly be contended that proof of such an injury alone would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way, peculiar.[28]

No such "peculiar" injury appears in the record here.

Plaintiff also argued before Judge Snyder that inasmuch as its members would normally obtain subcontracts from LPW-type projects, such members would be irreparably damaged by being placed at a competitive disadvantage *vis-à-vis* minority contractors. Since the general contractors would be forced to give priority to minority contractors in order to meet the MBE set-aside, it was maintained that Association members would be unable to obtain contracts.

This contention suffers from a number of defects. While the plaintiff's scenario has some plausibility, it is without substantial support in the record that was before Judge Snyder. The only instance adduced of an MBE who obtained a subcontract as a result of the set-aside was the case of the Brayman-Johnson contract discussed above. And while there was testimony that the members of the Association had in the past obtained between 40% and 80% of the heavy and highway construction contracts let by the Commonwealth and Pittsburgh in any given year, the testimony did not indicate which of these percentages represented *subcontracts* for which Association members would compete with MBEs. Insofar as it is the applicant for a preliminary injunction who bears the burden of establishing irreparable injury,[29] neither this Court nor the trial judge would be warranted in assuming that members of the Association, rather than other contractors, bore the brunt of the enhanced competition provided by the MBEs. There is thus no evidence of the magnitude of the injury caused by such competition, if any.

Moreover, to the extent that such subcontractors would be "injured" by the statute, minority businessmen would be equally injured by an injunction against the MBE set-aside. For every contract that the Association members lose to an MBE, under the statute, MBEs would presumably lose a contract to Association members under the injunction. Thus, in view of the lack of a strong showing of probability of success on the merits, any irreparable injury that has been demonstrated is offset by the countervailing possibility of improper harm to the beneficiaries of the Act.[30]

Finally, since under the LPW, construction of the projects was to have commenced by no later than December 29, 1977,[31] any additional injury that could occur prior to the federal hearing would, at least as the controversy was presented to us, be minimal.[32]

---

**28.** 530 F.2d 515, 527 (3d Cir. 1976).

**29.** *A. O. Smith Corp. v. FTC* 530 F.2d 515, 525 (3d Cir. 1976).

**30.** *Cf. Oburn v. Shapp,* 521 F.2d 142, 152 (3d Cir. 1975) (minorities given preference in admission to state trooper training program would be harmed to the extent that white applicants would be helped by preliminary injunction); *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 924 (3d Cir. 1974) (Competitive ports would be in-

jured to the extent that plaintiffs would be aided by preliminary injunction).

**31.** *See* 42 U.S.C. § 6705(d).

**32.** *Cf. Meccano Ltd. v. John Wanamaker,* 253 U.S. 136, 141–42, 40 S.Ct. 463, 64 L.Ed. 822 (1920).

We were informed at oral argument that in Pittsburgh, all 18 of the projects at issue had been advertised, 16 had already been awarded, and the award of the remaining two bids was then imminent.

Thus, when considered in light of the marginal showing of probable success on the merits which the plaintiff tendered, we cannot say it was an abuse of discretion for the district court to determine that plaintiff had shown no irreparable injury sufficient to justify granting a preliminary injunction.[33]

### E. THE PUBLIC INTEREST

An examination of the public interest consideration in the situation before us also supports the trial judge's exercise of discretion. The purpose of the LPW is to furnish prompt economic stimulation to a flagging economy, as well as to provide needed public works. Indeed, the Act itself stipulated that construction was to begin on funded projects no later than 90 days after a grant had been made. Delay in providing such stimulation would defeat a major purpose of the Act by depriving of their jobs individuals who might otherwise be employed, and by slowing the recovery of the economy in general.

The federal defendants argue that if the MBE provision falls, so must the entire Act, and a preliminary injunction against the MBE set-aside would deprive citizens of the economic benefits which Congress wished to confer. This is so, they maintain, because a prime purpose of the LPW was to afford relief from the unemployment which particularly afflicts minority communities.

Even if the MBE provision is severable, however, an injunction against its enforcement, at a time when projects had already been advertised, would have resulted in administrative confusion, and hence, inexorably, in delay. Such a postponement of the benefits of the Act would clearly have been against the public interest.

These considerations buttress our conclusion that Judge Snyder's determination was not an abuse of discretion.[34]

### F. CONCLUSION

Since we find no abuse of discretion, no error in applying the law, and no clear mistake in the consideration of the proof, the order of the district court will be affirmed.

---

**33.** Plaintiff also contends that its members are irreparably injured as a result of being denied their equal protection rights under the Fifth Amendment. This argument is undercut by the weakness of the showing of probable success on the merits. See Oburn v. Shapp, 521 F.2d 142, 151 (3d Cir. 1975). It should be noted that, unlike First Amendment rights whose deprivation even for minimal periods of time constitutes irreparable injury, see Elrod v.

Burns, 427 U.S. 347, 372–73, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a denial of equal protection rights may be more or less serious depending on the other injuries which accompany such deprivation.

**34.** See Yakus v. United States, 321 U.S. 414, 440–41, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Oburn v. Shapp, 521 F.2d 142, 151–52 (3d Cir. 1975).