H. Earl FULLILOVE, Fred Munder, Jeremiah Burns, Joseph Clarke, Gerard A. Neuman, William C. Finneran, Jr., Peter J. Brennan, Thomas Clarkson, Conrad Olsen, Joseph DeVitta, as Trustees of the New York Building and Construction Industry Board of Urban Affairs Fund, Arthur Gaffney as President of the Building Trades Employers Association, General Contractors Association of New York, Inc., General Building Contractors of New York State, Inc., and Shore Air-Conditioning Co., Inc., Plaintiffs-Appellants,

v.

Juanita KREPS, Secretary of Commerce of the United States of America, the State of New York and the City of New York, the Board of Higher Education and the Health & Hospitals Corporation, Defendants-Appellees.

No. 894, Docket 78–6011.

United States Court of Appeals, Second Circuit.

Argued May 24, 1978.

Decided Sept. 22, 1978.

Before OAKES, Circuit Judge, and BLU-MENFELD * and MEHRTENS,** District Judges.

**BLUMENFELD, District Judge:**

This is an appeal from the decision of the District Court, Werker, *J.*, that upheld the constitutionality of section 103(f)(2) of the Public Works Employment Act of 1977 (PWEA), 42 U.S.C. § 6705(f)(2). The statute mandates that "no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises." "Minority business enterprise" (MBE) is defined as "a business at least 50 per centum of which is owned by minority group members  .  .  . ." The statute defines minority group members in racial terms: "citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."

Appellants are several associations of contractors and subcontractors and a firm engaged in heating, ventilation and air conditioning work. Their application for a preliminary injunction on their petition for declaratory and injunctive relief to prevent the Secretary of Commerce as program administrator from enforcing the MBE provision was consolidated with a hearing on the merits. The District Court found that the provision was a constitutionally valid exercise of congressional power to remedy the effects of past discrimination in the construction industry. The District Court denied their petition and dismissed the complaint. We affirm.

Robert G. Benisch, Berman, Paley, Goldstein & Berman, French, Fink, Markle & McCallion, New York City, Doran, Colleran, O'Hara & Dunne, Garden City, N. Y. (Robert J. Fink, New York City, Richard L. O'Hara, Robert A. Kennedy, Robert J. Aurigema, William M. Savino, Stephen J. Smirti, Jr., Garden City, of counsel), on brief, for plaintiffs-appellants.

Robert B. Fiske, Jr., U. S. Atty., New York City, Drew S. Days, III, Asst. Atty. Gen., Civil Rights Div., U. S. Dept. of Justice, Washington, D. C. (Gaines Gwathmey, III, Dennison Young, Jr., Mary C. Daly, Patrick H. Barth, Asst. U. S. Attys., New York City, Vincent F. O'Rourke, Jr., Jessica Dunsay Silver, Washington, D. C., of counsel), for defendant-appellee Kreps.

Dominick J. Tuminaro, Asst. Atty. Gen. of the State of New York, New York City (Louis J. Lefkowitz, Atty. Gen., George D. Zuckerman, Asst. Atty. Gen. in charge of Civil Rights Bureau, Arnold D. Fleischer, Asst. Atty. Gen., New York City, of counsel), for defendant-appellee State of New York.

I.

In 1976 Congress enacted the Local Public Works Capital Development and Investment Act of 1976, Pub.L.No.94–369 (July 22, 1976), 90 Stat. 999–1012, 42 U.S.C.

---

* Senior United States District Judge for the District of Connecticut, sitting by designation.

** Senior United States District Judge for the Southern District of Florida, sitting by designation.

§§ 6701–6735, designed to help alleviate nationwide unemployment in the economically depressed construction industry by appropriating $2 billion for public works projects. The Secretary of Commerce was to administer the program through the Economic Development Administration (EDA), charged with distributing funds under the Act to state and local governments. Congress mandated that the program be administered expeditiously[1] and the Secretary approved grants for the entire appropriation by February 1977. In May 1977, Congress supplemented the initial appropriation through the Public Works Employment Act of 1977, Pub.L.No.95–28 (May 13, 1977), 91 Stat. 116–121, 42 U.S.C. §§ 6701–6736, to the extent of an additional $4 billion.

During the consideration of the PWEA on the floor of the House, the MBE requirement was introduced as an amendment to the Act. As contained in the final enactment, the provision reads:

"Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos and Aleuts."

The appellants' attack is aimed only at the amendment; they do not contend that the inclusion of the amendment rendered the entire statute unconstitutional.

The question presented in this appeal is a narrow one. We are called upon to decide whether Congress acted in a constitutionally permissible manner in conditioning the receipt of federal grants for local public works projects under the PWEA upon the requirement that 10 percent of the grants be allocated to minority business enterprises.

## II.

■ At the outset we note that when Congress seeks to exercise its spending powers, it is required to distribute federal funds in a manner that neither violates the equal protection rights of any group nor continues the effects of violations that have occurred in the past, for

" '[s]imple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination.' "

*Lau v. Nichols,* 414 U.S. 563, 569, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974), *quoting* 110 Cong.Rec. 6543 (1964) (remarks of Sen. Humphrey, quoting from President Kennedy's message to Congress, June 19, 1963).

■ The Secretary acknowledges that in enacting the MBE provision Congress created an explicitly race-based condition on the receipt of PWEA funds. Under modern equal protection standards,[2] racial

---

1. The Act required that each eligible project be started within 90 days of EDA approval (42 U.S.C. § 6705(d)), any application that was not rejected within 60 days of its submission to EDA would be deemed approved (42 U.S.C. § 6706), and the EDA was ordered to promulgate regulations governing grant applications within 30 days of the Act's passage (42 U.S.C. § 6706). The Act became law on May 24, 1977 and funds allocated under the PWEA had to be committed to an approved state or local project by September 30, 1977.

2. Although the Equal Protection Clause appears only in the fourteenth amendment, which applies only to the states, the Supreme Court has held that the equal protection principles of the fourteenth amendment are embodied in the Due Process Clause of the fifth amendment. *See Hampton v. Mow Sun Wong,* 426 U.S. 88, 99–100, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

classifications are "suspect." This denomination often triggers the highest level of scrutiny imposed by the courts. *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Usually when a classification turns upon an individual's racial or ethnic background, "he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Regents of University of California v. Bakke,* —— U.S. ——, ——, 98 S.Ct. 2733, 2753, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.); *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). Whether rigid scrutiny is mandated whenever an act of Congress conditions the allocation of federal funds in a manner which differentiates among persons according to their race is a question we need not reach, for we are of the opinion that even under the most exacting standard of review the MBE provision passes constitutional muster.[3]

## III.

The principles which the court below applied in rejecting the appellants' contentions that the amendment was either unconstitutional or in violation of the Civil Rights Act of 1964 are not in dispute on this appeal. However, we restate them briefly in order to put the appellants' argument that they were misapplied by the trial judge into sharper focus.

The appellants agree that the district judge correctly decided that "strict scrutiny" was required, but they contend that the standard of review which such scrutiny requires was not correctly applied. Having conceded below and properly so, that "a compelling state interest is present if the racial classification is intended to remedy the vestiges of present and/or past discrimination," they advance two separate arguments that a compelling interest was not shown.

Their argument is that there was not an adequate basis for the court below to conclude that Congress' purpose was to remedy prior wrongs to minority groups who had been denied opportunities in the construction industry as a result of race discrimination. This proposition has two elements that are analytically distinct. That they are treated in combination is understandable for they are bound together and rest to some extent on the same history and policy considerations. The amendment is permissible only if it is a remedy for past discrimination. *See Regents of the University of California v. Bakke, supra,* —— U.S. at ——, 98 S.Ct. 2754 (opinion of Powell, J.). Whether it was Congress' *purpose* to enact a remedy for past discrimination is one question. Whether such discrimination occurred in the past is another question. The second question depends upon an assessment of historical facts, the first upon what was in the mind of Congress.

### A. *Congress' Purpose*

Congressional purpose is relevant to consideration of whether the classification is permissible. Under any equal protection test "the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation . . . ." *F. S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920).[4] More

---

**3.** Four Justices of the Supreme Court have indicated that an intermediate standard of scrutiny is sufficient when Government "acts not to demean or insult any racial group, but to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative, or administrative bodies with competence to act in this area." *Bakke, supra,* —— U.S. at ——, 98 S.Ct. at 2766 (opinion of Brennan, White, Marshall and Blackmun, JJ.) and *see id.* at ——— · — ·, 98 S.Ct. 2783–2787. Mr. Justice

Powell, however, rejected that view and the other four Justices did not reach the question.

**4.** The notion that any conceivable purpose which would uphold a classification should be attributed to it, *e. g., McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), allows for more judicial restraint than strict scrutiny permits. In *McGowan* the Court stated that the Equal Protection Clause is violated only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective—a statutory discrimi-

recently in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973), the Court said that even if strict judicial scrutiny was not required, the statute "must still be examined to determine whether it rationally furthers some legitimate, articulated[5] state purpose and . . . does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." *See also* L. Tribe, *American Constitutional Law* § 16–30 at 1083–85 (1978); Gunther, *The Supreme Court, 1971 Term—Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 20–22 (1972). Since strict scrutiny should require no less, we turn our attention to whether Congress articulated its purpose in enacting the amendment.

■ The rule for ascertaining what the purpose of Congress was in enacting a statute that is subject to scrutiny under the Equal Protection Clause is more deferential than the rule which would be applied to test a state statute. In differentiating a law passed by Congress from a mandate by a state legislature, or an administrative agency, the Court has said, "Alternatively, if the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption." *Hampton v. Mow Sun Wong,* 426 U.S. 88, 103, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976). That a large measure of judicial restraint must be accorded to Congress in its enactment of legislation to remedy past discrimination was affirmed recently in *Regents of the University of California v. Bakke, supra,* —— U.S. at —— n. 41, 98 S.Ct. at 2755 (opinion of Powell, J.):

> "[W]e are not here presented with an occasion to review legislation by Congress pursuant to its powers under § 2 of the Thirteenth Amendment and § 5 of the Fourteenth Amendment to remedy the effects of prior discrimination. *Katzenbach v. Morgan,* 384 U.S. 641, [86 S.Ct. 1717, 16 L.Ed.2d 828] (1966); *Jones v. Alfred H. Mayer,* 392 U.S. 409, [88 S.Ct. 2186, 20 L.Ed.2d 1189] (1968). We have previously recognized the special competence of Congress to make findings with respect to the effects of identified past discrimination and its discretionary authority to take appropriate remedial measures."

Judge Werker did not base his decision that it was the purpose of Congress to remedy past discrimination solely on a presumption. There is no need to rely solely on a bare presumption to determine the purpose of Congress. The classification established by the amendment is self-evident. The amendment makes no sense unless it is construed as a set-aside to benefit minority subcontractors.[6] It has been suggested that "[i]f an objective can confidently be inferred from the provisions of the statute itself, recourse to internal legislative history and other ancillary materials is unnecessary." Note, *Developments in the Law— Equal Protection,* 82 Harv.L.Rev. 1065, 1077 (1969). It is also beyond dispute that the set-aside was intended to remedy past discrimination. To support that conclusion, it is "enough that [the court] perceive a basis upon which Congress might predicate a judgment that" the MBE amendment would remedy past discrimination against

nation will not be set aside if any state of facts may reasonably be conceived to justify it.

5. Since no content was given to the word "articulated," we view it as a prophylactic against resort to the "any conceivable reason" justification of *McGowan.* See note 4 *supra.*

6. The appellants argue that the legislative history is silent with respect to any purpose to remedy the effect of past discrimination, and shows only that $4 billion which Congress allocated under the PWEA was expected to generate 300,000 jobs in other industries. But, by that particular amendment (§ 103(f)(2)), injected in the Act from the floor during the course of the debate, Congress did not create more jobs. It is clear from the amendment that Congress intended to guarantee that part of the jobs already contemplated by the PWEA would go to minority businesses, and not, as the plaintiffs contend, to "disadvantaged as opposed to minority small businesses."

minority construction businesses. *See Katzenbach v. Morgan, supra,* 384 U.S. at 656, 86 S.Ct. 1717. In view of the comprehensive legislation which Congress has enacted during the past decade and a half for the benefit of those minorities who have been victims of past discrimination,[7] any purpose Congress might have had other than to remedy the effects of past discrimination is difficult to imagine.

## B. Past Discrimination

Although Congress' purpose and the factual background from which it sprang are not so disjoined that they could not be considered together, Judge Werker considered the question of past discrimination separately. The comprehensive opinion of the District Judge to which we make reference considered remarks made on the floor of the House when the MBE provision was introduced during the debate on the PWEA. He noted that Representative Mitchell, the amendment's sponsor, criticized the federal program of assistance to minority businesses that permits them to become "viable entities in our system" only to be "cut off" when government contracts are awarded.

See Joint App. 160a; 123 Cong.Rec.H. 1437 (daily ed. Feb. 24, 1977), *reprinted in Associated General Contractors v. Secretary of Commerce,* 441 F.Supp. 955, 997–1006 (C.D. Cal.1977) (Appendix C). In concluding that Congress found past discrimination, he also properly relied upon remarks made by Representative John Conyers of New York. Speaking in favor of the amendment, the Representative observed that "minority contractors and businessmen who are trying to enter in on the bidding process . . . *get the 'works' almost every time." Id.* (emphasis added). Those remarks clearly disclosed the connection between the past discrimination and the "set-aside" amendment, and powerfully reinforced the conclusion reached by the judge.[8]

That an explicit finding of past discrimination was not included in the committee reports may sometimes be "troublesome." *Constructors Association v. Kreps,* 441 F.Supp. 936, 952 (W.D.Pa.1977), *aff'd,* 573 F.2d 811 (3d Cir. 1978).[9] In this case it is not surprising in view of the manner in which the amendment was introduced.[10]

---

**7.** For example, Civil Rights Act of 1964, Pub. L.No. 88–352, 78 Stat. 241 (codified at 28 U.S.C. § 1447; 42 U.S.C. §§ 1971, 1975a–1975d, 2000a to 2000h–6); Pub.L.No. 92–261, §§ 2–8, 10, 11, 13, 86 Stat. 103–113 (codified at 42 U.S.C. §§ 2000e, 2000e–1 to 2000e–6, 2000e–8, 2000e–9, 2000e–13 to 2000e–17); Pub.L.No. 92–318, title IX, § 906(a), 86 Stat. 375 (codified at 42 U.S.C. §§ 2000c, 2000c–6, 2000c–9); Pub. L.No. 93–608, § 3(1), 88 Stat. 1972 (codified at 42 U.S.C. § 2000e–4); Pub.L.No. 94–273, § 3(24), 90 Stat. 377 (codified at 42 U.S.C. § 2000e–14); Voting Rights Act of 1965, Pub. L.No. 89–110, 79 Stat. 437; Pub.L.No. 90–284, title I, § 103(c), 82 Stat. 75; Pub.L.No. 91–285, §§ 3–6, 84 Stat. 315; Pub.L.No. 91–405, title II, § 204(e), 84 Stat. 853; Voting Rights Act Amendments of 1970, Pub.L.No. 91–285, 84 Stat. 314, 315; Voting Rights Act Amendments of 1975, Pub.L.No. 94–73, title II, §§ 204, 206, title IV, § 405, 89 Stat. 402, 404 (codified at 42 U.S.C. § 1971 *et seq.*); Civil Rights Act of 1968, Pub.L.No. 90–284, 82 Stat. 73–92 (codified at 18 U.S.C. §§ 231–233, 241, 242, 245, 1153, 2101, 2102; 25 U.S.C. §§ 1301–1303, 1311, 1312, 1321–1326, 1331, 1341, 28 U.S.C. § 1360 nts.; 42 U.S.C. §§ 1973, 3533, 3535, 3601–3619, 3631); Pub.L.No. 93–265, 88 Stat. 84 (codified at 25 U.S.C. § 1341).

**8.** Statements made in debates may be regarded as authoritative indicia of congressional intent. *Pan American World Airways, Inc. v. CAB,* 380 F.2d 770, 782 (2d Cir. 1967). The situation here was similar to that in *United States v. Oates,* 560 F.2d 45, 72 (2d Cir. 1977), where the court said: "It is, of course, of critical importance that it was with the explanations of [the Representative who sponsored the amendment] freshly in mind that the full House of Representatives on the very day these remarks were uttered finally approved" the bill. The MBE amendment was considered and passed by the House on February 24, 1977, the date these statements were made on the floor. H.R. Rep.No. 95–20, 95th Cong., 1st Sess., *reprinted in* [1977] U.S.Code Cong. & Admin.News 150. The remarks were much more extensive but were all to the same effect.

**9.** Judge Snyder in *Constructors Ass'n v. Kreps, supra,* found the same passage sufficient evidence that Congress enacted the MBE provision to remedy past discrimination in the construction industry.

**10.** This explains the absence of any mention of the amendment in the Committee reports. Furthermore, the lack of extended discussion

But the absence of such a finding in the reports is not determinative. The record that was considered provided sufficient justification for a finding of past discrimination. Cf. *Arizona v. Washington*, 434 U.S. 497, 513, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (when record provides sufficient justification for trial judge's mistrial ruling, ruling not subject to collateral attack simply because judge failed to make explicit finding of "manifest necessity" for mistrial). The record may be sparse, but it is not entirely silent.

The judge quite properly took account of the data and observations contained in a report prepared by the Department of Commerce to evaluate existing opportunities for minority business. See U.S. Dept. of Commerce, Office of Minority Business Enterprise, *Minority Business Opportunity Handbook* (August 1976). Noting plaintiffs' objection to the soundness of the data contained in the report, the Judge found "even if the statistics for minority businesses were to be doubled, there would still be an ample basis for Congress to conclude that 'the severe shortage of potential minority entrepreneurs with general business skills is a result of their historical *exclusion* from the mainstream economy.'" Joint App. 161a quoting from the *Minority Handbook* at 1–1–2 (court's emphasis included).

Moreover the judge undertook consideration of evidence that Congress had recorded elsewhere to support its finding that the history of discrimination was specific to the construction industry. A report prepared by the House Subcommittee on Small Business Administration Oversight and Minority Business Enterprise contains the following statement:

> clearly indicates the knowledge of the congressmen concerning the well-established history of past discrimination in the construction industry.

11. Many of those cases are cited by Chief Judge Coffin in support of a decision upholding that principle in *Associated Gen. Contractors v. Altshuler*, 490 F.2d 9, 16–17 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974), along with *Contractors Ass'n v. Secretary of Labor*, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30

"The very basic problem . . . is that, over the years, there has developed a business system which has traditionally excluded measurable minority participation. In the past more than the present, this system of conducting business transactions overtly precluded minority input. Currently, we more often encounter a business system which is racially neutral on its face, but because of past overt social and economic discrimination is presently operating, in effect, to perpetuate these past inequities. Minorities, until recently have not participated to any measurable extent, in our total business system generally, *or in the construction industry, in particular.* However, inroads are now being made and minority contractors are attempting to 'break-into' a mode of doing things, a system, with which they are empirically unfamiliar and which is historically unfamiliar with them."

Summary of Activities of the Committee on Small Business, House of Representatives, 94th Congress, at 182–83 (November 1976) (emphasis added). The judge's finding that Congress acted upon sufficient evidence of past discrimination is more than amply supported by the record and establishes a "perceived" basis for congressional action.

## IV.

In employment discrimination cases it is well established that the government's interest in overcoming the disadvantages resulting from past discrimination in employment on account of race is sufficiently compelling to justify a remedy which requires the use of racial preferences.[11] The

L.Ed.2d 95 (1971), which is cited with approval in *Bakke*, —— U.S. at ——, 98 S.Ct. 2754.

Section 6705(f)(2) merely broadens the economic area in which that principle applies to include independent contractors in the construction industry. We do not attempt to draw any distinction between services and materials which might be furnished by independent subcontractors on construction jobs. We note, however, that a person conducting a minority business who is denied an opportunity to compete for a certain amount of business on account of his race would have a cause of

vitality of the rationale in those cases was not disturbed by the recent decision of the Court in *Regents of the University of California v. Bakke, supra.* The Justices did not disagree with the principle that race-conscious remedies can be imposed when there have been judicial, legislative or administrative findings of past discrimination and the remedies fashioned are appropriately drawn to rectify that discrimination. *Id.,* —— U.S. at —— & n. 41, 98 S.Ct. 2755 (opinion of Powell, J.).[12]

■ In affirmative action programs to remedy the effects of past discrimination the effect of preferring members of the injured groups at the expense of others must be considered. In *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), Mr. Justice Powell, at 784–86, 96 S.Ct. 1251 (concurring & dissenting), warned that affirmative action ordered as equitable relief must not exceed the bounds of fundamental fairness. *See Acha v. Beame,* 531 F.2d 648 (2d Cir. 1976). It is established that in fashioning remedies for past discrimination courts must be sensitive to interests which may be adversely affected by the remedy. The courts, here, as in a number of other areas where legislation for which there is a compelling interest collides with constitutional principles, have adopted an ad hoc balancing test which examines each particular

case, *e. g. Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (public interest in law enforcement outweighs reporters' first and fourteenth amendment interest in keeping news sources confidential). One of the significant limitations on a remedy of "reverse discrimination" for past discrimination is that its effects shall "not be 'identifiable,' that is to say, concentrated upon a relatively small, ascertainable group of non-minority persons." *EEOC v. Local 638 . . . Local 28, Sheet Metal Workers,* 532 F.2d 821, 828 (2d Cir. 1976). *See also Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 427 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). The amendment at issue falls well within such a boundary against inequitable results. The PWEA which added $4 billion to the $200 million not yet expended portion of the amount authorized by Round I (Local Public Works Act) amounted to about 2.5 percent of the total of nearly $170 billion spent on construction in the United States for 1977, according to Department of Commerce statistics.[13] The set-aside for minority contractors under the PWEA was for 10 percent of the total grant and thus extends to only .25 percent of funds expended yearly on construction work in the United States. The extent to which the reasonable expectations of these appellants, who are

action under 42 U.S.C. § 1981. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Hollander v. Sears, Roebuck & Co.,* 450 F.Supp. 496, 499–500 (D.Conn. 1978).

12. As Mr. Justice Powell noted:
"We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations. See, *e. g., Teamsters v. United States,* 431 U.S. 324, 367–376, [97 S.Ct. 1843, 52 L.Ed.2d 396] (1977); *United Jewish Organizations v. Carey,* 430 U.S. 144, 155–156, [97 S.Ct. 996, 51 L.Ed.2d 229] (1977); *South Carolina v. Katzenbach,* 383 U.S. 301 [86 S.Ct. 803, 15 L.Ed.2d 769] (1960). After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the

legal rights of the victims must be vindicated. In such a case, the extent of the injury and the consequent remedy will have been judicially, legislatively, or administratively defined. Also, the remedial action usually remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit. Without such findings of constitutional or statutory violations, it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another. Thus, the government has no compelling justification for inflicting such harm."
*Regents of the Univ. of Cal. v. Bakke, supra,* —— U.S. at —— ——, 98 S.Ct. at 2757 (footnote omitted).

13. U.S. Dept. of Commerce, Industry and Trade Administration, *Construction Review* May-June 1978, at 11.

part of that industry, may have been frustrated is minimal. Furthermore, since according to 1972 census figures minority-owned businesses amount to only 4.3 percent of the total number of firms in the construction industry, the burden of being dispreferred in .25 percent of the opportunities in the construction industry was thinly spread among nonminority businesses comprising 96 percent of the industry.[14] Considering that nonminority businesses have benefited in the past by not having to compete against minority businesses, it is not inequitable to exclude them from competing for this relatively small amount of business for the short time that the program has to run.

Ours is not the only circuit in which the MBE amendment's constitutionality has been challenged by associations of general contractors. Other cases that have denied preliminary injunctions against enforcement of the "set-aside" provision are *Rhode Island Chapter, Associated General Con-*

tractors v. Kreps, No. 77–0676 (D.R.I. Feb. 6, 1978); *Associated General Contractors v. Secretary of Commerce,* No. 77–4218 (D.Kan. Dec. 19, 1977); *Carolinas Branch, Associated General Contractors v. Kreps,* 442 F.Supp. 392 (D.S.C.1977); *Ohio Contractors Association v. Economic Development Administration,* 452 F.Supp. 1013 (S.D.Ohio 1977); *Montana Contractors Association v. Secretary of Commerce,* 439 F.Supp. 1331 (D.Mont.1977); *Florida East Coast Chapter v. Secretary of Commerce,* No. 77–8351 (S.D.Fla. Nov. 3, 1977). *But see Associated General Contractors v. Secretary of Commerce,* 441 F.Supp. 955 (C.D.Cal.1977), *vacated and remanded,* —— U.S. ——, 98 S.Ct. 3132, 57 L.Ed.2d 1153 (1978), which held the provision invalid.[15] That case reached the Supreme Court where it was remanded to the District Court for consideration of mootness. *See also Wright Farms Construction, Inc. v. Kreps,* 444 F.Supp. 1023 (D.Vt.1977).[16]

**14.** U.S. Bureau of the Census, *1972 Census of Construction Industries: Industries Series, United States Summary—Statistics for Construction Establishments With and Without Payrolls,* Table A 1 (Aug. 1975); U.S. Bureau of the Census, *1972 Survey of Minority-Owned Business Enterprises: Minority-Owned Businesses,* Table 1 (May 1975).

**15.** In *Associated Gen. Contractors v. Secretary of Commerce, supra,* the court held that § 103(f)(2) of the PWEA is inconsistent with Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000d–1. The trouble with that conclusion is that it is based on the overbroad premise that *any* reverse discrimination in a remedy for past discrimination is prohibited *per se* by Title VI. A majority of the Supreme Court has held that "Title VI goes no further in prohibiting the use of race than the Equal Protection Clause of the Fourteenth Amendment itself." *Regents of the Univ. of Cal. v. Bakke, supra,* —— U.S. at ——, 98 S.Ct. at 2767 (opinion of Brennan, White, Marshall and Blackmun, JJ.); *id.* at ——, 98 S.Ct. 2747 (opinion of Powell, J.). As we have shown above, a remedy for the effects of past discrimination which results in a not unreasonable amount of reverse discrimination is not unconstitutional. *See, e. g., Franks v. Bowman Transportation Co., supra. See also Acha v. Beame, supra; United States v. Sheet Metal Workers Local 36,* 416 F.2d 123 (8th Cir. 1969). The effect here is minimal when compared with *Rios v. Enterprise Ass'n Steamfitters Local Union 638,* 501 F.2d 622 (2d Cir. 1974), which

upheld an order to a union to admit minority applicants to an apprenticeship program in sufficient numbers to achieve a goal of 30 percent nonwhite membership.

**16.** In *Wright Farms Constr., Inc. v. Kreps, supra,* the court made a specific finding that Vermont had a small minority population, and therefore held the MBE provision unconstitutional as applied to contractors in that state. However, Congress clearly manifested its intent that the set-aside provision should not apply in such a case. See 123 Cong.Rec. 1437 (daily ed. Feb. 24, 1977), *reprinted in Associated Gen. Contractors v. Secretary of Commerce, supra,* 441 F.Supp. at 998–99 (Appendix C), where Representative Mitchell, the sponsor of the amendment, engaged in the following colloquy with Representative Kazen:

"Mr. Kazen: All right. What happens in the rural areas where there are no minority enterprises? Will the 10 percent be held up in order to bring minority enterprises from somewhere else where there is no unemployment into a place where there is unemployment and there is no minority enterprise?

"Mr. Mitchell of Maryland: In response to the gentleman's question, the answer is 'No.'

". . .

". . . Let me tell the gentleman why that would not occur. When Presidents Nixon and Ford put out their Executive orders to all the agencies to utilize minority contractors, the agencies then established certain

■ Both the Third and the Sixth Circuits have upheld the constitutionality of the MBE amendment. *Constructors Association v. Kreps*, 573 F.2d 811 (3d Cir. 1978); *Ohio Contractors Association v. Economic Development Administration*, 580 F.2d 213 (6th Cir. 1978). We agree with their decisions that section 103(f)(2) of the Public Works Employment Act of 1977, 42 U.S.C. § 6705(f)(2), is not unconstitutional.

The judgment is affirmed.

guidelines which said, all right, we will utilize these minority contractors wherever possible, but where there are none, there can be no utilization, and therefore no project should be delayed.

"For example, I would not expect to take my minority contractors from Maryland into Idaho to meet that State's requirement. That will not be an issue.

"Mr. Kazen: If the gentleman would yield further, this is what I wanted the gentleman to clarify, that where there are no minority enterprise contractors [then] this provision would not be in effect; am I correct?

"Mr. Mitchell of Maryland: That is absolutely correct, and that is done by administrative action already on the books with all of the agencies.

"Mr. Kazen: Does the gentleman's amendment leave room for that type of discretion in the Secretary?

"Mr. Mitchell of Maryland: I assume that it does. It would be my intent that it would because that is existing administrative law." As Representative Mitchell amplified further, 123 Cong.Rec. 1438, *reprinted in* 441 F.Supp. at 1000:

". . . I reiterate what I said earlier, that we already have in existence within the agency structure the SOP administrative law that says this kind of amendment would not apply where there are no minority contractors or where there are no minorities. It is already in the law."