PETTINARO CONSTRUCTION COMPANY, INC., Wyman Electrical Service, Ralph G. Degli Obizzi, Inc., Vets Welding Shop, New Construction Company, Plaintiffs,

v.

DELAWARE AUTHORITY FOR REGIONAL TRANSIT, a Delaware Legislative Public Body; Lois Matushefsky, Individually and in her capacity as Chairman of the Dart Commission; Marcie Bierlein, Individually and in her capacity as Vice Chairman of the Dart Commission; Thomas W. Brokenbrough, Individually and in his capacity as Secretary of the Dart Commission; James H. Gilliam, Sr., Individually and in his capacity as Commissioner of the Dart Commission; Rodney W. Willis, Individually and in his capacity as Commissioner of the Dart Commission; and Gerald T. Haugh, Executive Director of the Delaware Authority for Regional Transit, a Delaware Legislative Public Body, Defendants.

Civ. A. No. 76–64.

United States District Court, D. Delaware.

Oct. 17, 1980.

David Roeberg of Roeberg & Associates, P.A., Wilmington, Del., for plaintiffs.

Robert D. Graham and Benjamin C. Wetzel, III of Bayard, Brill & Handelman, P.A., Wilmington, Del., for defendants.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

This litigation falls into the ranks of that class of cases made famous by *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and commonly referred to as reverse discrimination cases. Pettinaro Construction Company ("Pettinaro"), a Delaware corporation, was low bidder on a construction project to build an operations center for the Delaware Authority for Regional Transit ("DART"), but was refused the contract award because of its failure to allocate at least 15% of the total construction cost of the center to minority subcontractors. Plaintiffs, Pettinaro and some of the subcontractors listed in its bid, have filed suit under 42 U.S.C. §§ 1981 and 1983 against defendants, DART and its Executive Director and Board of Commissioners, alleging unlawful discrimination on the basis of race. The Court has before it plaintiffs' motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Those facts which are not contested by the parties reveal the following: DART is a local transportation authority established by act of the state legislature. (Docket Item ["D.I."] 1, ¶ 2; D.I. 4, ¶ 2.) Sometime prior to June 4, 1975, DART entered into a financial assistance contract with the United States Department of Transportation ("DOT") which provided that DOT, through the Urban Mass Transportation Administration, would assist DART in financing the construction of an operations center, to be erected in New Castle County, Delaware. (D.I. 1, ¶ 4; D.I. 4, ¶ 4.) On June 4, 1975, DART formally solicited bids for the construction of the center and through its architects issued a manual outlining the bidding specifications for the project. (D.I. 1, ¶ 5; D.I. 4, ¶ 5.) This project manual, as originally issued, included an affirmative action provision contained in Paragraph 16 of "Division One–General Requirements" ("Paragraph 16"), which stated:

In connection with the performance of this contract, the contractor will cooperate with DART in meeting his commitments and goals with regard to the maximum utilization of minority business enterprises and will use its best efforts to

insure that minority business enterprises shall have the maximum practicable opportunity to compete for subcontract work under this contract.

(D.I. 32, p. 3; D.I. 34, p. 2.)

Two weeks after the manual was issued, under circumstances which are not entirely clear on the present record, the affirmative action provision was amended by adding the following paragraphs:

As a goal, the Delaware Authority for Regional Transit will endeavor to have minority contractors perform as subcontractors a minimum of fifteen percent (15%) of the total construction contract plan, thereby enabling those subcontractors to establish performance records, and managerial and technical know-how/skills.

A minority contractors' directory/registry will be available at Wilmington Business Opportunities and Economic Development Corporation ... and at the State Office of Minority Business Enterprises (OMBE), ....

Consistent with Delaware Authority for Regional Transit's commitment to affirmative action in the utilization of minority entrepreneurs, the Authority shall require all prospective general contractors submitting bid proposals for the construction of this project to include in their bid proposal the required minimum of 15% or more of minority contractors to satisfy the Authority's goal which shall include "set aside" and/or other techniques. Any bids received not complying with the above 15% minority contractors requirements will not be considered and will be returned. "Set aside" proposals of contractors will be formally advertised for competitive bidding among prospective minority subcontractors. The portions of contracts suitable for "set aside" will be determined by the Delaware Authority for Regional Transit, in consultation with the State OMBE and the Construction Contractors Assistance Center unit of Wilmington Business Opportunities and Economic Development Corporation and other local legitimate organizations knowledgeable about the Delaware area minority business community, and shall reflect the actual capabilities of the minority business community. All persons seeking a contract from the Delaware Authority for Regional Transit shall submit concurrently with his/her bid proposal an Affirmative Action Assurance Plan which addresses both affirmative action regarding utilization of minority contractors, subcontractors and suppliers. Supportive data regarding both parts of the prospective contractor's Affirmative Action Assurance Plan shall be submitted by all general contractors with their proposed bid.

(D.I. 32, pp. 3–4; D.I. 34, pp. 3–5.)

Pettinaro claims that it made a good faith effort to comply with Paragraph 16, as amended, by obtaining the minority contractors directory/registry and contacting over ten minority subcontractors listed therein. According to Pettinaro, "a substantial number" of those contractors solicited indicated that they did not have the facilities to bid on a project of the magnitude of the proposed operations center. (D.I. 32, p. 5.) Two minority subcontractors, however, did in fact submit bids to Pettinaro. One of these bids was the lowest offered in the particular subcontractor category and was accepted; the other bid was purportedly $60,000 above the lowest bid received by Pettinaro in that category and was rejected. *Id.* at 5–6. As a result, Pettinaro's bid as general contractor for the proposed operations center, as submitted to DART, allocated less than 1% of the total construction price to minority subcontractors. (D.I. 34A, ex. 3.)

The bids were opened on July 2, 1975, and Pettinaro's bid was the lowest tendered. On July 15, 1975, DART's architects for the operations center wrote to Pettinaro requesting it to provide information concerning its subcontractors and "any 'set aside' or other techniques" set forth in its bid proposal for the purpose of determining whether Pettinaro had complied with the minority business enterprise requirements of Paragraph 16. (D.I. 34A, ex. 2.) Petti-

naro responded by acknowledging that the one minority subcontractor listed in its bid would account for less than 1% of the total bid price, but asserted that "it is our intention to push any work not included in the required list of subcontractors in the direction of minority owned enterprises" and "to purchase material from minority owned suppliers." (D.I. 34A, ex. 3, p. 1.)

The Board of Commissioners of DART met to review Pettinaro's response on July 18, 1975, and after "consider[ing] all the available evidence," determined that Pettinaro's bid must be rejected as "non–responsive" because of its failure to satisfy the requirements of Paragraph 16. (D.I. 34A, ex. 4.) Pettinaro was notified of this decision and the contract was subsequently awarded to Ehret of Delaware, Inc., the lowest bidder that had complied with the minority business enterprise requirements.[1]

Plaintiffs filed this suit on February 8, 1976, charging DART, its Executive Director and Board of Commissioners with discriminating on the basis of race, and seeking money damages to vindicate the purported infringement of plaintiffs' civil rights. Plaintiffs argue that the minority business enterprise provision contained in Paragraph 16 operated as a racial quota, creating a classification on the basis of race which was unjustified by any compelling state interest. Defendants do not directly refute plaintiffs' characterization of Paragraph 16 as a racial quota but argue, nonetheless, that the minority business enterprise provision was necessitated by a compelling governmental interest in redressing prior racial discrimination against minority businesses.

Both parties agree that in resolving this case, the Court must be guided by the Supreme Court decisions in *University of California Regents v. Bakke, supra,* and *Fullilove v. Klutznick,* —— U.S. ——, 100 S.Ct.

2758, 65 L.Ed.2d 902 (1980). Although neither of these decisions commanded a consensus, the parties have synthesized the opinions of the individual Justices and have apparently concluded that the minority business enterprise provision could pass constitutional muster if the following two conditions were met: (1) the provision was supported by a finding of a competent judicial, legislative or administrative body that unlawful discrimination had in the past been perpetrated against minority business enterprises; and (2) the minority business enterprise requirement at issue in this case was narrowly drawn to remedy the prejudicial effects flowing from the specific prior discrimination.

Plaintiffs contend that in formulating Paragraph 16, DART failed to satisfy, and indeed was incapable of satisfying, these two criteria. Plaintiffs argue that DART's legislative mission does not include the authority to make findings of racial discrimination. DART is said to be entrusted only with matters bearing on public transportation and is not competent either to identify instances of discrimination or to fashion appropriate remedies to eliminate any possible effects arising from alleged prior discrimination. Furthermore, plaintiffs argue that even if defendants were competent to make these findings, defendants never engaged in such a considered analysis and no such findings were in fact adopted. Finally, plaintiffs contend that assuming *arguendo* that defendants formulated Paragraph 16 pursuant to a proper finding of prior discrimination, the provision was not sufficiently narrow to insure that innocent third parties were not unduly prejudiced and, therefore, must fail for overinclusiveness under *Fullilove.* Because the facts underlying these issues purportedly are not in dispute, plaintiffs claim that they are entitled to summary judgment as a matter of law.

---

1. Ehret of Delaware, Inc. ("Ehret") also received a letter from DART's architects dated July 15, 1975, requesting information from Ehret as to how its bid complied with Paragraph 16. In a letter dated two days later, Ehret informed DART that it had contracted with two minority subcontractors for work totaling $232,000 and had set aside an additional sum of $19,000 to be allocated to minority business enterprises. Because this total exceeded 15% of Ehret's base bid proposal, Ehret concluded that it had complied with Paragraph 16 in all respects.

Defendants' rejoinder maintains that the 15% minority business enterprise provision was included in the project manual at the insistence of two federal agencies, the Urban Mass Transportation Administration and the Wilmington Business Opportunities & Economic Development Corp., an office within the Department of Commerce. Their insistence on this requirement, in turn, purportedly was prompted by a vast array of findings by the Congress, various federal agencies, and the President that minority business enterprises had suffered, and indeed continued to suffer, from the effects of prior racial discrimination. Defendants also argue, moreover, that the minority business set–aside was narrowly tailored to redress the effects of this prior racial discrimination. Accordingly, defendants conclude that under *Fullilove* the minority business enterprise requirement was a constitutionally permissible race–conscious remedy which resulted in no deprivation of plaintiffs' rights.

Furthermore, defendants contend that there are a number of material factual issues in dispute which preclude disposition of this case by summary judgment at this time. Specifically, defendants assert that the existence of findings of past discrimination by a competent body is disputed by the parties, as is the issue of whether the remedy selected to alleviate the consequences of the purported prior discrimination is sufficiently circumscribed. Accordingly, defendants argue that plaintiffs' motion for summary judgment must be denied.[2]

■ As this Court has consistently stated, as the party moving for summary judgment, plaintiffs bear a heavy burden. Under Rule 56(c), summary judgment is never proper except when a clear showing is made by the moving party that no genuine issue of any material fact exists. *Suchomajcz v.*

*Hummel Chemical Co.*, 524 F.2d 19, 24 (C.A.3, 1975). In the context of a summary judgment motion, the court's inquiry can be a limited one. Its initial task is solely to determine whether questions of fact exist. Once it finds that material factual issues are in dispute, it must leave resolution of these issues to another day and deny the moving party's motion for summary relief. *United States ex rel. Jones v. Rundle*, 453 F.2d 147, 150 (C.A.3, 1971). Although it is clear that a court should not strain to find genuine factual issues where none exist, neither may a court ignore a bona fide factual dispute. *Tomalewski v. State Farm Ins. Co.*, 494 F.2d 882, 884 (C.A.3, 1974), *quoting Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (C.A.7, 1972). Moreover, in determining in the first instance whether such factual disputes are present, a court must resolve all inferences, doubts or issues of credibility in favor of the opposing party. *United States ex rel. Jones v. Rundle, supra*, 453 F.2d at 150; *Hayes v. Cape Henlopen School District*, 341 F.Supp. 823 (D.Del. 1972). Accordingly, bearing in mind that the burden of justifying summary relief lies with the moving party, summary judgment is inappropriate "where there is the slightest doubt as to the facts." *Tomalewski v. State Farm Ins. Co., supra*, 494 F.2d at 884.

■■ Besides being subject to the normally stringent prerequisites for the granting of summary relief, plaintiffs bear an added burden because of the important constitutional questions involved in this case. Although summary judgment motions are never to be granted on the basis of inadequate and controverted factual records, where constitutional issues of large public import are involved, the Court's scrutiny of the record, to ensure that there are no disputed issues of material fact, must be particularly exacting. *See* 6 Pt. 2 Moore's

2. Defendants also assert as affirmative defenses that: (1) by participating in the bidding process, plaintiffs acquiesced in, and waived any right to contest, the legality of Paragraph 16; and (2) even if plaintiffs' constitutional rights were violated, DART's Commissioners and Executive Director acted in good faith in adopting and implementing the minority business enterprise provision and are thus immune from the imposition of money damages. Defendants argue that each of these defenses present disputed issues of material fact which must have the benefit of formal trial. Curiously, defendants did not plead the immunity defense in their answer and have not moved to amend their answer accordingly.

Federal Practice ¶ 56.17(10) at 772 (1979). As the parties correctly note, while it is well settled that "racial classifications by government are not to be taken lightly," *Contractors Ass'n of Western Pennsylvania v. Kreps*, 573 F.2d 811, 816 (C.A.3, 1978), it is equally true that the use of racial preferences is permissible if it is designed to eliminate the vestiges of prior or continuing discrimination. *Id.* The vitality of this principle has been consistently affirmed in this and other Circuits, *see id.; Fullilove v. Kreps*, 584 F.2d 600 (C.A.2, 1978), *aff'd sub nom. Fullilove v. Klutznick, supra; Associated General Contractors v. Altshuler*, 490 F.2d 9 (C.A.1, 1973), *cert. denied*, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); *Contractors Ass'n v. Secretary of Labor*, 442 F.2d 159 (C.A.3), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), and was left intact by the Supreme Court decision in *Bakke* wherein five members of the Court held that government may take race into account "to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative or administrative bodies with competence to act in this area." *University of California Regents v. Bakke, supra*, 438 U.S. at 325, 98 S.Ct. at 2766 (Opinion of Brennan, White, Marshall and Blackmun, JJ.); 438 U.S. at 302, 98 S.Ct. at 2754 (Opinion of Powell, J.); *see Fullilove v. Kreps, supra*, 584 F.2d at 606–607. More recently, in *Fullilove v. Klutznick, supra*, the Supreme Court expressed its continued adherence to this basic precept by holding that Congressional enactment of a minority business enterprise provision, requiring that 10% of all federal funds granted for local public works projects be used by the grantee to procure the services of minority businesses, was a valid means of redressing the effects of prior discrimination. A majority of the Justices agreed that in enacting this provision, Congress had ample grounds for concluding that minority business enterprises had received a disproportionately small amount of public contracts because of the continuing effects of prior discrimination, and that the use of traditional contracting practices would serve only to perpetuate this imbalance. *See* 100 S.Ct. at 2775 (Opinion of Burger, J.); 100 S.Ct. at 2796 (Opinion of Marshall, J.). Under the principles articulated in these decisions, plaintiffs' motion cannot be granted unless there is undisputed evidence that the racial preference imposed in this case was not supported by a legitimate finding of prior discrimination by a competent body and was not designed to redress the present effects of this past discrimination.

■ When examined under these stringent standards and against the backdrop of complex constitutional issues framed by the pleadings, it is clear that this case is not ripe for summary adjudication. The gravamen of plaintiffs' complaint is that findings of past discrimination were not in fact made by a competent governmental body. Yet, as defendants correctly point out, the parties vigorously dispute the manner in which Paragraph 16 came to be adopted and in the absence of this critical information, a determination that the purported quota was unjustifiably imposed cannot be made.

Both in their opening brief in support of summary judgment, and at oral argument, plaintiffs admitted that "[h]ow and why DART established this quota is a bit of a mystery." (D.I. 32, p. 13.) Because defendants maintain that Paragraph 16 was formulated in response to the directives of two federal agencies pursuant to Congressional, executive and administrative findings of past discrimination against minority enterprises, plaintiffs' candid admission clearly is fatal to their claim that there are no material facts in dispute and that, accordingly, they are entitled to judgment as a matter of law. Moreover, what little evidence plaintiffs have adduced in support of their motion is cursory at best. Plaintiffs point to the deposition of Donald F. Neizer, manager of operations for DART, to demonstrate that Paragraph 16 was the result of a "coordinated effort between DART, the Urban Mass Transportation Administration (Federal), the Office of Minority Enterprises (State) and the Wilmington Business Opportunities & Economics Development Cor-

poration (Federal). . . ." (D.I. 32, p. 14.) Plaintiffs maintain that the deposition clearly establishes that "the language relied on to formulate Paragraph 16 as amended came from similar language used for federally assisted construction projects in Miami, Ohio" and that accordingly, "no prior determination of past discrimination in Delaware was made by a competently charged body." *Id.* Not surprisingly, defendants strongly contest this argument and the Court agrees that this meagre evidence, standing alone, is too insubstantial a basis on which to conclude that plaintiffs' version of the facts is unequivocally correct.

Plaintiffs have also argued that notwithstanding the uncertainty surrounding the evolution of Paragraph 16, none of the federal or state offices mentioned above were vested with authority to identify instances of past constitutional violations and to impose race conscious remedies. Beyond citing the Court to DART's enabling statute for the first time at oral argument, plaintiffs have not even attempted to support this contention with specific factual documentation. Nor have plaintiffs otherwise factually established their allegation that no legislative, executive or administrative criteria governing the formulation of remedial measures to eliminate the effects of prior discrimination against minority enterprises was extant at the time Paragraph 16 was developed. In fact, the DOT regulations governing federal grants at the time the facts underlying this suit occurred, and cited by plaintiffs in their brief, contradict this very conclusion. Section 21.5(b)(7) of those regulations provides in part:

> This part does not prohibit the consideration of race, color, or national origin if the purpose and effect are to remove or overcome the consequences of practices or impediments which have restricted the availability of, or participation in, the program or activity receiving Federal financial assistance, on the grounds of race, color, or national origin. Where prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or

to subject them to discrimination under any program or activity to which this part applies, the applicant or recipient [for the federal grant] must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage.

The issues presented by this case reflect the tension produced by the government's efforts to rule impartially at the same time that it attempts to ameliorate the effects of perceived prior discrimination through the use of race–conscious remedies. In determining what balance must be struck between these competing interests in each case, the Court must be assured of an adequate factual record, and cannot rest a decision granting summary relief on the basis of bald assertions unsupported by any cogent factual predicate. Accordingly, plaintiffs' motion for summary judgment is hereby denied.